# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 15-cr-40 (MJD/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| David Edward Jakel, | |
| Defendant. | |

Katharine T. Buzicky, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for the United States of America

Robert D. Richman, P.O. Box 16643, St. Louis Park, MN 55416, for David Edward Jakel

HILDY BOWBEER, United States Magistrate Judge

## I.    Introduction

This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 41] and Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 42].  These motions have been referred to the undersigned for report and recommendation under 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  The Court held a hearing on the motions on April 1, 2015.  For the reasons set forth below, it is recommended that both motions be denied.

**II.      Background**

Defendant is charged with one count of distribution of child pornography, in

violation of 18 U.S.C. § 2252(a)(2) and (b)(1), and one count of possession of child

pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  (Indictment [Doc.

No. 18].)

**A.      Search Warrant**

On January 6, 2015, United States Magistrate Judge Franklin L. Noel signed the

search warrant at issue, authorizing the search of 6321 Martin Avenue Northeast in

Albertville, Minnesota.  (Apr. 1, 2015, Hr'g, Gov't's Ex. 2.)  The search warrant identified

various items to be seized, including: (1) images of child pornography and files containing

images of child pornography; (2) books, ledgers, and records bearing on the production,

reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any

kind involving the transmission through interstate or foreign commerce of any visual

depiction of minors engaged in sexually explicit conduct; (3) credit card information

including bills and payment records; (4) records evidencing occupancy or ownership of the

above property; (5) records or other items indicating ownership or use of computer

equipment found on this property; and (6) bags, cases, and containers that can be used to

store, transport, and/or move portable computers and computing devices.  (*Id.*)

Shane A. Ball, Special Agent for the Federal Bureau of Investigation, submitted the

affidavit in support of the search warrant application.  (*Id.*, Ball Aff.)  It stated:

- On February 14, 2014, a task force officer (TFO) with the Minnesota Child
  Exploitation Task Force used undercover investigative software to partially
  download the content of one payload file of child pornography from a host computer

2

at IP address 68.119.18.179.  The host computer was reported to be located in Elk River, Minnesota.  In response to an administrative subpoena about this IP address, Charter Communications stated that the subscriber at the time of download was Defendant, located at 6321 Martin Avenue Northeast in Albertville, Minnesota. (Ball Aff. at 15-17.)

- Between April 24, 2014, and October 9, 2014, the TFO worked undercover with the Minnesota Cybercrime Task Force, using the undercover investigative software to completely and partially download six files from a host computer at IP address 71.10.98.156.  The TFO was also able to observe (but not download or fully describe) other files with titles indicative of child pornography from IP address 71.10.98.156.  The host computer was reported to be located in Albertville, Minnesota.  In response to administrative subpoenas concerning this IP address, Charter Communications reported that the subscriber at the time of these downloads was Defendant, located at 6321 Martin Avenue Northeast in Albertville, Minnesota. (*Id.* at 17-20.)

- A check of the predatory offender database showed that Defendant was required to register as a sex offender until October 3, 2011, as related to a juvenile conviction for First Degree Sexual Conduct with a victim then aged five.  (*Id.* at 20.)

- The TFO and Agent Ball personally viewed the downloaded files set forth above and determined that they depict child pornography.  (*Id.*)

- On November 29, 2014, Agent Ball conducted surveillance on 6321 Martin Avenue Northeast in Albertville, Minnesota, and found a 2009 Subaru Impreza, Minnesota license plate number 775 AWH, parked in the garage.  This vehicle is listed in the Minnesota vehicle license database as being registered to Defendant.  (*Id.* at 20-21.)

- Agent Ball verified through a public records database that Defendant was using the address at 6321 Martin Avenue Northeast in Albertville, Minnesota, as of November 29, 2014.  (*Id.* at 21.)

Based on this information, Agent Ball believed there was probable cause that evidence of a criminal offense was located at 6321 Martin Avenue in Albertville, Minnesota.  (*Id.*)

## B.    Defendant's Statements

At the April 1, 2015, hearing, Wright County Detective Michael Lindquist testified credibly for the Government, and Kayla Trevino and James Person testified credibly for

Defendant.  Various exhibits were received, including the transcription and audio-recording of the January 12, 2015, interview with Defendant (Gov't's Exs. 1, 7); the search warrant and related documents (Gov't's Ex. 2); photographs of the interior and exterior of the house at 6321 Martin Avenue (Gov't's Exs. 3-6); documents reflecting the sunrise time and weather on January 12, 2015 (Def.'s Exs. 1, 2A-2B); and photographs of the exterior and interior of the house at 6321 Martin Avenue (Def.'s Exs. 3-8).  The testimony and exhibits establish the following facts.

On January 12, 2015, Agent Ball, accompanied by twelve other law enforcement personnel,[1] executed the search warrant described above, beginning at 6:01 a.m.  (Hr'g Tr. at 23-24 [Doc. No. 54].)  Around that time, the sky was still dark, and the temperature was approximately one degree below zero, and negative sixteen degrees with wind chill.  (*Id.* at 26-27; Def.'s Exs. 2A, 2B.)  Kayla Trevino was in her bedroom, getting ready for work, when she heard a loud knocking at the front door.  (Tr. at 53.)  Looking up the stairs from her bedroom, she saw flashlight beams sweeping across the floor.  (*Id.*)  Assuming that someone was trying to break in, Ms. Trevino began to yell, and her husband Griffin Trevino and their other roommate upstairs, James Person, went to check the front door.  (*Id.*)

Mr. Person was wearing a long-sleeve shirt, jeans, and socks, and Mr. Trevino, barefoot, was wearing pajamas consisting of pants and a shirt.  (Tr. at 57, 81.)  When

---

[1]  In total, there were six federal agents, a computer forensic specialist, three Wright County detectives, and three Wright County deputies.  (Hr'g Tr. at 24 [Doc. No. 54].) That day, Agent Ball was wearing plain clothes: dress pants, dress shirt, a tie, and a winter coat.  (*Id.* at 11.)  He carried a sidearm, but it was not visible.  (*Id.*)  Agent Ball wore khaki pants and a darker jacket, and a bulletproof vest under the jacket.  (*Id.*) Agent Ball's sidearm was also concealed.  (*Id.*)

Mr. Person reached the front door, an officer pulled him out of the house and passed him to another officer on the sidewalk. (*Id.* at 81.) He was then handcuffed and placed against the side of the house in a snow-covered area. (*Id.*) Mr. Person estimated being outside in handcuffs for about twenty minutes.[2] (*Id.* at 82.)

By the time Ms. Trevino reached the main level of the house, she saw her husband and Mr. Person handcuffed outside, standing against the side of the house in a snow-covered area. (*Id.* at 56-57.) The officers asked her to come outside, but because she was barefoot and wearing a tank top, she objected and was permitted to stand in the open doorway with her hands up on the front door. (*Id.* at 57-58.)

Shortly after, Defendant came downstairs, wearing only pants. (*Id.* at 59.) The officers shined flashlights in Defendant's face, handcuffed him, and put him next to Ms. Trevino inside the house. (*Id.*) Both Defendant and Ms. Trevino were frisked and remained in their positions for what Ms. Trevino believed to be approximately twenty to thirty minutes. (*Id.*)

While the front door was open, Ms. Trevino's dog ran outside and barked. (*Id.* at 60.) After the dog barked for a few minutes, Ms. Trevino asked to call the dog inside. (*Id.* at 61.) The officer next to her told her not to yell, asked for the dog's name, and got another officer to yell for the dog. (*Id.*) The dog returned inside, and as Ms. Trevino bent over to grab the dog, she was told to put her hands up against the door, which caught her off guard. (*Id.*) Ms. Trevino was allowed to put the dog in the garage. (*Id.*)

---

[2] The Court notes that this estimation is potentially inconsistent with the documented start time of the search warrant execution at 6:01 a.m. and the start time of Defendant's interview at 6:12 a.m.

The officers searched the house and moved Defendant, Mr. Trevino, Ms. Trevino, and Mr. Person into the living room. (*Id.* at 60.)  Each roommate was accompanied by an officer, and only Ms. Trevino was not handcuffed. (*Id.*)  Detective Lindquist testified that Agent Ball *asked* Defendant if he would be willing to be interviewed. (*Id.* at 51.) Ms. Trevino testified, however, that in Defendant's presence, they were *told* that they would each be questioned in the sub-basement because it was a secure room. (*Id.* at 62-64.)

Detective Lindquist and Agent Ball questioned Defendant first because he owned the house. (*Id.* at 38, 64, 84.)  On the way to be interviewed, Defendant asked if he could go to his room to get a shirt. (*Id.* at 38-39.)  His request was denied; however, an officer retrieved a sweatshirt for him. (*Id.* at 39.)  Defendant's handcuffs were removed so that he could put on the sweatshirt, so that by the time he was escorted downstairs, he was no longer handcuffed. (*Id.* at 38-39.)  With one officer in front and another behind him, Defendant walked down two sets of stairs to the sub-basement. (*Id.* at 65.)

The sub-basement is a finished room with carpeting and furniture. (Def.'s Exs. 6-7; Gov't's Exs. 4-6.)  The furniture includes two couches along two walls, placed at a ninety-degree angle from each other, a coffee table in front of the couches, and various bookshelves appearing to hold DVDs and other items. (Gov't's Exs. 5-6.)  Movie posters are framed on certain walls, electronic equipment is mounted to a wall, and there is a large screen wall television. (*Id.*)  This room is separated from other rooms in the house, and from the living room, one cannot hear what is happening in the sub-basement. (Tr. at 65.)

It was still dark outside when Defendant's interview started at 6:12 a.m., and the shades to the sub-basement were drawn. (*Id.* at 37, 66; Gov't's Ex. 1.)  Initially, the door to

the sub-basement was opened partially, but at some point during the interview, it was closed. (Tr. at 37.) Agent Ball and Detective Lindquist sat on the larger couch, while Defendant sat on the smaller couch. (*Id.* at 13.) At the start of the interview, Detective Lindquist informed Defendant that he was not under arrest, and Defendant responded, "O.K." (Gov't's Ex. 1 at INT_00000002.) Detective Lindquist continued, "you're not under arrest, you're free to leave, um, you're under no obligation to provide a statement at this time but, uh, we'd like to get your side of what our investigation has revealed thus far, so." (*Id.*) Agent Ball then repeated that Defendant was not under arrest, and stated, "if I ask you a question you don't wanna answer, you don't have to answer the question. If you get sick of me or sick of Mike, you tell us you're sick of this, all right." (*Id.*) Defendant responded, "Hm-hm." (*Id.*) Agent Ball explained that Defendant was handcuffed previously for officer safety, and Defendant expressed his understanding, commenting, "Yeah" and "Keep us from going after you guys." (*Id.*) Detective Lindquist and Agent Ball then began to question Defendant substantively with respect to this case, and Defendant made a series of incriminating statements. The interview ended at 6:51 a.m., after which Defendant was not arrested. (*Id.* at INT_00000026.)

Meanwhile, two Wright County deputies were in the living room with the three other roommates. (Tr. at 44.) After Defendant's interview, Detective Lindquist and Agent Ball interviewed Mr. Person, who volunteered to go second because he was trying to get to work. (*Id.* at 84.) Mr. Person was escorted to and interviewed in the sub-basement. (*Id.* at 85.) After the interview finished, he was taken back to the living room. (*Id.*) At that point, Mr. Person did not leave for work. (*Id.* at 86.) Although Mr. Person was told that he was

free to go, he did not feel that to be true because his car keys were in his room; he wasn't

sure if he would be able to back his car out of the driveway; and he did not have his phone

to use for work or to let his colleagues know that he was on his way.  (*Id.*)

After Mr. Person's interview, Ms. Trevino was escorted to and interviewed in the

sub-basement.  (*Id.* at 71.)  Agent Ball and Detective Lindquist told her that she was free to

leave, which Ms. Trevino understood to mean that she was not a target and would be free to

leave when they finished questioning her.  (*Id.* at 73.)  Ms. Trevino felt the environment was

not one in which she was allowed to leave, because her computer was taken and her car,

parked in the garage, was blocked by vehicles in the driveway.  (*Id.* at 66-67.)  Mr. Trevino

was the last to be interviewed.  (*Id.* at 84.)

The entire search lasted approximately two to three hours.  (*Id.* at 74.)  During this

time, Ms. Trevino, Mr. Trevino, Mr. Person, and Defendant did not leave the living room,

except to be accompanied to the sub-basement for their interviews.  (*See id.* at 78, 86.)  At

no point was Defendant advised of his *Miranda* rights.

## III.   Discussion

### A.    Motion to Suppress Evidence Obtained as a Result of Search and Seizure

Defendant moves to suppress any physical evidence obtained as a result of the search

and seizure on January 12, 2015, arguing the search warrant for the residence was not

supported by probable cause, and the search conducted under that warrant was

unconstitutional.  (Mot. Suppress Evidence at 1.)[3]

---

[3]  Defendant's post-hearing memorandum in support of his motion to suppress did not
address this issue, nor did he present any evidence at the hearing directed to the

In reviewing a search warrant for probable cause, "only that information which is found within the four corners of the affidavit may be considered." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982). A reviewing court "should interpret affidavits for search warrants in a commonsense and realistic fashion, and deference is to be accorded an issuing magistrate's determination of probable cause." *Id.* There is probable cause "if there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Estey*, 595 F.3d 836, 840 (8th Cir. 2010).

Agent Ball's affidavit provided sufficient probable cause for issuing the search warrant for 6321 Martin Avenue Northeast in Albertville, Minnesota. The warrant properly identified the location of the search and the items to be seized. The data obtained via the undercover investigative software permitted a reasonable inference that child pornography might be found on any computer associated with the individual who used the IP addresses 68.119.18.179 and 71.10.98.156. Through administrative subpoenas to Charter Communications, law enforcement linked these IP addresses to Defendant, located at 6321 Martin Avenue Northeast.[4] Additional investigation showed that Defendant lived at this

_____

sufficiency of the warrant. It is not clear, therefore, whether he decided to waive his motion to suppress with respect to the evidence seized in connection with the warrant, but the Court addresses it here for the sake of completeness.

[4] "[W]hen determining whether probable cause exists to search a computer, an IP address assigned to a specific user at the time illegal internet activity associated with that IP address occurs has been found to be a sufficient basis to find a nexus between that unlawful use of the internet and a computer possessed by the user assigned that IP address." *United States v. Furman*, No. 14-cr-323 (DSD/LIB), 2015 WL 1061956, at *6 (D. Minn. Mar. 11, 2015) (citing, *inter alia*, *United States v. Stults*, 575 F.3d 834, 844 (8th Cir. 2009), which affirmed a probable cause finding where the affidavit supporting

address, and that Defendant was registered as a sex offender until October 3, 2011, as

related to a juvenile conviction for First Degree Sexual Conduct with a victim then aged five

years old.  On these facts, as of January 6, 2015, Agent Ball had probable cause to believe

that child pornography would be found on any computers and storage media located at

6321 Martin Avenue Northeast.  Thus, the Court recommends that the evidence seized

under the warrant not be suppressed.

### B.      Motion to Suppress Statements, Admissions, and Answers

Defendant also moves to suppress his statements, arguing he was effectively in

custody during his interview and therefore should have been advised of his *Miranda* rights.

(Def.'s Mem. Supp. Mot. Suppress Confessions, Admissions, and Answers at 6 [Doc.

No. 55].)

*Miranda v. Arizona*, 384 U.S. 436 (1966), prohibits the government from

"introducing into evidence statements made by the defendant during a custodial

interrogation unless the defendant has been previously advised of his fifth amendment

privilege against self-incrimination and right to an attorney."  *United States v. Chipps*,

410 F.3d 438, 445 (8th Cir. 2005).  *Miranda* warnings are required for official

interrogations where a person has been "taken into custody or otherwise deprived of his

freedom of action in any significant way."  *Stansbury v. California*, 511 U.S. 318, 322

(1994).  Law enforcement is not required, however, to administer *Miranda* warnings to

everyone they question.  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  They are

---

the search warrant application referred to an IP address that had been used to access child
pornography and was traced to a defendant).

required "only where there has been such a restriction on a person's freedom as to render him in custody." *Id.* In deciding whether a person was "in custody," courts examine the presence and extent of restraints, both physical and psychological, placed on the person's liberty during the interrogation "in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody," or, put another way, believed his "freedom of action had been restrained to a 'degree associated with formal arrest.'" *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (quoting *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990)); *see also United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004).

The Eighth Circuit sets forth six common indicia of custody: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was under arrest at the termination of the questioning. *Griffin*, 922 F.2d at 1349. The first three indicia are mitigating factors, which, if present, weigh against the existence of custody at the time of questioning. *Axsom*, 289 F.3d at 500-01. Conversely, the last three indicia are aggravating factors, which, if present, weigh in favor of custody. *Id.* at 501.

11

The *Griffin* factors are representative and not exclusive.  *Czichray*, 378 F.3d at 827.

"A finding of custody does not require the factual circumstances of a case to present all

indicia; and a particularly strong showing of one factor may compensate for a lesser or non-

existent showing of another factor."  *Axsom*, 289 F.3d at 501.  The Court will use the *Griffin*

factors as a framework for analysis and discuss each factor in turn.

### 1.    Advice Given By Officers

The first *Griffin* factor is whether the suspect was informed at the time of questioning

that the questioning was voluntary, that the suspect was free to leave or request the officers

to do so, or that the suspect was not considered under arrest.  *Griffin*, 922 F.2d at 1349.

"[T]he most obvious and effective means of demonstrating that a suspect has not been taken

into custody . . . is for the police to inform the suspect that an arrest is not being made and

that the suspect may terminate the interview at will."  *Id.*  "Where a suspect has been so

advised, custody has frequently been found to not exist."  *Id.*

It is undisputed that, at the beginning of the interview, Detective Lindquist and

Agent Ball informed Defendant that he was not under arrest, was free to leave, and was not

required to provide a statement.  Detective Lindquist stated:

> . . . I just wanna . . . make sure you understand at this point you're not under
> arrest, O.K.  This is still an open investigation.  Um, Special Agent Ball as
> well as other agents in law enforcement have been basically doing an
> investigation and, which resulted in enough probable cause for us to do a
> search warrant on your house here today, O.K.

(Gov't's Ex. 1 at INT_00000002.)  Defendant responded, "O.K.," and Detective Lindquist

continued:

Um, well like I said right now you're not under arrest, you're free to leave, um, you're under no obligation to provide a statement at this time but, uh, we'd like to get your side of what our investigation has revealed thus far, so.

(*Id.*)  Agent Ball then chimed in:

. . . if I ask you a question you don't wanna answer, you don't have to answer the question.  If you get sick of me or sick of Mike, you tell us you're sick of this, all right.  There's no, there's no drama here.  Uh, we're gonna be in the house for, you know, probably a couple hours, that's usually about how long this takes . . . you're not under arrest, your handcuffs are off.

(*Id.*)  Defendant responded, "Hm-hm," and continued talking with the officers.  (*Id.*)

There was some dispute in the testimony at the hearing about whether, in the living room before the interviews commenced, Agent Ball "asked" Defendant if he was willing to be interviewed, or "told" all those assembled that they would be interviewed.  What is not in dispute, however, is that both Detective Lindquist and Agent Ball told Defendant later, in the sub-basement sitting room, as the interview began, that he was free to leave, he was not under arrest, and that he was not required to answer their questions.  Accordingly, the Court finds that the first mitigating factor exists and weighs against a finding that Defendant was in custody.

## 2.    Unrestrained Freedom of Movement

The second *Griffin* factor is whether the suspect's freedom of movement was restricted during questioning.  *Griffin*, 922 F.2d at 1349.  "Circumstances of custody are frequently obviated where the suspect's freedom of action is not curtailed during questioning."  *Id.* at 1350.  Although suspects are often escorted or chaperoned during questioning for reasons other than custody, "the relevant inquiry is the *effect on the suspect*."  *Id.* (emphasis in original).  Restraints associated with a formal arrest include

being "placed under guard during questioning, or told to remain in the sight of interrogating officials." *Id.* at 1351.

In *Axsom*, nine federal agents and other employees executed a search warrant, seeking evidence of child pornography. 289 F.3d at 497. When they knocked and announced their presence, the defendant came to the door wearing only a towel. *Id.* The agents escorted the defendant to the bedroom to dress. *Id.* Later, the defendant was escorted to the bathroom. *Id.* At the beginning of the interview, when the defendant stood up to get a drink, he was told to "hold on just a minute," and another agent brought a drink to him. *Id.* at 498. The district court found the second *Griffin* factor to be absent because the defendant was not permitted to move about at will during the interview, with which the Eighth Circuit found no error. *Id.* at 501.

Similarly, in the instant case, Defendant came to the front door wearing only pants. (Tr. at 59.) When Defendant asked if he could retrieve a shirt, the request was denied, and an officer retrieved a sweatshirt for him from his room. (*Id.* at 38-39.) Although he was initially handcuffed, restraining an individual in handcuffs and asking him to remain in a certain area "during the initial security sweep is not indicative of . . . custody, but rather is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence." *United States v. Durand*, No. 11-cr-228 (MJD/JJK), 2011 WL 5444112, at *7 (D. Minn. Oct. 24, 2011) (Keyes, Mag. J.).

While in the living room, Defendant and his roommates were continuously in the presence of law enforcement, and no one left the living room except to be interviewed. (*See* Tr. at 62-64.) Ms. Trevino and Mr. Person testified that although they were told they were

14

free to leave, they understood that to mean they were free to leave only after they had been

interviewed.  (*Id.* at 73, 84.)  On the other hand, Defendant and the others did not try to

leave.  Where a defendant makes no attempt to leave, and there is no evidence concerning

what the officers would have done if he had, the Eighth Circuit has found the restraint-of-

movement factor "unclear."  *United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012).

Defendant was then escorted from the living room to the sub-basement with one officer in

front of him, and another behind him.  (Tr. at 65.)   Defendant was not handcuffed or

otherwise physically restrained during the interview, but he was in the officers' presence the

entire time.  (Gov't's Ex. 1.)

On the whole, the Court concludes a reasonable person under these circumstances

would likely have felt his freedom of movement to be restrained to some degree.  Thus, the

second mitigating *Griffin* factor is absent here.

### 3.    Who Initiated the Interview

The third *Griffin* factor is whether the suspect initiated contact with authorities or

voluntarily acquiesced to official requests to respond to questions.  922 F.2d at 1349.

Courts have found no custody where "suspects take the initiative to offer statements or

voluntarily arrange for questioning."  *Id.* at 1351.  By contrast, courts have found custody to

exist where law enforcement, rather than the suspect, instigates the confrontation between

the suspect and the criminal justice system.  *Id.*

In *Axsom*, the Eighth Circuit found this mitigating factor was present, finding that

although the district court had correctly concluded the defendant did not initiate or arrange

for the questioning, it had failed to analyze whether the defendant voluntarily acquiesced to

answer the agents' questions.  289 F.3d at 501.  The Eighth Circuit noted the defendant's

testimony at the suppression hearing that he would have answered questions because he

believed it was in his best interest to appear friendly and cooperative to the agents.  *Id.*

It also noted the defendant's "extremely friendly and cooperative" demeanor during the

interview, and his offer to show agents which of his computers contained child

pornography, among other items.  *Id.* at 502.

Similarly, in the present case, Defendant did not initiate or arrange for the officers'

questioning.  He did, however, voluntarily acquiesce to Detective Lindquist's and Agent

Ball's requests for him to answer questions.  Unlike Axsom, Defendant did not

affirmatively offer to assist the agents with their search, nor did he testify at the hearing that

he would have answered their questions regardless of whether he perceived himself to be in

custody, but the audio-recording and transcript of the interview reflect that he was friendly

and cooperative.  (Gov't's Exs. 1, 7.)  The tone of the interview was civil and

conversational, and there was periodic laughter by both Defendant and Detective Lindquist.

(*Id.*)  Taking all of these facts into account, the Court finds that the third *Griffin* factor is

present to some extent, weighing slightly against a finding of custody.

### 4.    Tactics Used

The fourth *Griffin* factor is whether strong arm tactics or deceptive stratagems were

employed during questioning.  922 F.2d at 1349.  These tactics and stratagems include

confronting suspects with false or misleading witness statements, lying repeatedly to the

suspect, employing a good cop/bad cop routine, separating the suspect from nearby friends

or family, using persistent and relentless questioning, giving false legal advice in an attempt

to trick the suspect into a confession, or manipulating the suspect's insecurities about his surroundings. *United States v. Peterson*, No. 14-cr-328 (JRT/FLN), 2015 WL 1585507, at *7 (D. Minn. Apr. 2, 2015) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987); *Miranda v. Arizona*, 384 U.S. 436, 455 (1966)).

Defendant acknowledges that the officers did not yell at or threaten him. (Mem. Supp. Mot. Suppress Confessions, Admissions, and Answers at 14.) He argues, however, that Agent Ball used strong arm tactics and deceptive stratagems to convey that law enforcement knew what Defendant had done, would inevitably find evidence of the crime, and minimized the moral seriousness of the offense. (*Id.* at 14-18.)

In *Axsom*, the Eighth Circuit concluded that law enforcement did not use strong arm tactics or deceptive stratagems during their questioning, because although armed, the agents did not take a threatening posture toward the defendant, display their weapons, or show physical force during the questioning. 289 F.3d at 502. The court also noted the defendant's testimony that the agents asked "straightforward questions" and the defendant gave "straightforward answers." *Id.*

Even more notable, in *Czichray*, the Eighth Circuit declined to find this aggravating factor where the agents told the defendant in his home that if he did not cooperate, the agents would "light up his world," interview the defendant's 75-year old father and others, and could use the Federal Bureau of Investigation to pressure insurance companies to withhold payments from his business. 378 F.3d at 825. The court observed that "some degree of coercion is part and parcel of the interrogation process and [ ] the coercive aspects of a police interview are largely irrelevant to the custody determination except where a

17

reasonable person would perceive the coercion as restricting his or her freedom to depart."

*Id.* at 829 (citing *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004)).

In the instant case, Agent Ball and Detective Lindquist did not use strong arm tactics or deceptive stratagems during their questioning. They carried but did not display their firearms, and they did not use physical force. (Tr. at 11; Gov't's Exs. 1, 7.) The tone of the interview was civil and conversational. (Gov't's Exs. 1, 7.) They did not make any promises to Defendant; on the contrary, Agent Ball stated, "the one thing I will say . . . as far as like the future, I do not know. Depending on what we find, how you handle yourself, I don't know." (Gov't's Ex. 1 at INT_00000026.) They did not threaten Defendant with negative consequences if he did not answer their questions. Nor did they confront Defendant with false or misleading witness statements, lie to Defendant, use a good cop/bad cop routine, question him relentlessly, give false legal advice, or use other such deceptive stratagems that have concerned courts. Finally, the Court notes the relatively short length of the interview—thirty-nine minutes. *See United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (finding no strong arm tactics where the period of questioning lasted "some forty-five minutes to two hours, certainly not a marathon session designed to overcome [the defendant's] will"); *Czichray*, 378 F.3d at 825 (finding no custody where the interview lasted nearly seven hours). Thus, the absence of this fourth *Griffin* factor weighs against a finding of custody.

### 5.    Police Domination of the Atmosphere

The fifth *Griffin* factor looks at whether the entire context of the questioning was police-dominated. 922 F.2d at 1349. Courts consider, for example, the place and length of

the questioning, whether the police assumed control of the site, and whether the police dictated the course of conduct followed by the suspect or others present at the scene. *Id.* at 1352. Courts are more likely to find custody where the police lead a suspect to believe that they have taken full control of the scene. *Id.* Questioning that occurs in an atmosphere dominated by the police is more likely to be viewed as custodial than one that does not. *Id.* at 1351-52.

In *Axsom*, the Eighth Circuit disagreed with the district court's finding of a police-dominated atmosphere, noting that although nine agents and specialists participated in the execution of the search warrant, only two agents conducted the interview; questioning was two-way between the agents and the defendant; and the defendant was interviewed in the comfort and familiarity of his home. 289 F.3d at 502.

In this case, it is true that, as in *Axsom*, only two officers conducted the interview with Defendant and in his own home. The Court is mindful that "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." *Id.* Nonetheless, *Griffin* observed that "the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting." 922 F.2d at 1354-55. In *Griffin*, the Eighth Circuit found evidence of a police-dominated, custodial environment because as soon as the defendant arrived at home, the agents met him in the hallway and removed him to the dining room of the house, away from his parents. *Id.* at 1355. The court believed that "[a]ny objective reasonable person would conclude from these actions that the authorities were now in complete control of the defendant." *Id.*

19

In the present case, Defendant, upon coming downstairs, was confronted by officers shining flashlights in his face, handcuffing him, and frisking him, while Mr. Trevino and Mr. Person were handcuffed outside, standing in a snow-covered area.  (Tr. at 59, 81-82.) Defendant and his roommates were then moved into the living room, where they remained continuously in the presence of law enforcement and were informed that they would each be questioned in the sub-basement.  (*Id.* at 62-64.)  Defendant was then escorted by two officers to the sub-basement, where he was separated from his roommates.  (*Id.* at 65.) On the way to the sub-basement, Defendant's request to retrieve a shirt was denied, although an officer retrieved a sweatshirt for him.  (*Id.* at 38-39.)  By dictating the course of conduct for Defendant and his roommates, the officers effectively assumed control of the site, despite being in Defendant's home.

The Court does not suggest that law enforcement's actions in securing the home were inappropriate.  The Government's memorandum in opposition to Defendant's motion goes to great lengths to point out that law enforcement personnel must do what is necessary to secure the site in order to assure the safety of the officers and the preservation of the physical evidence they seek.  (Gov't's Mem. Opp'n Mot. Suppress Confessions, Admissions, and Answers at 6-7 [Doc. No. 56].)  The Court does not disagree.  As the Eighth Circuit noted in *United States v. Williams*, "*Miranda* applies only when the circumstances approximate a formal arrest, and a search warrant is not an arrest.  Police inevitably 'dominate' the atmosphere in some sense while they are conducting a search."  760 F.3d 811, 813 (8th Cir. 2014).  But the Court must still take account of even the legitimate actions of law enforcement in considering whether the

totality of the circumstances created a custodial environment that triggered Defendant's

right to a *Miranda* warning.  On the facts presented here, the Court concludes the fifth

*Griffin* factor is present and weighs slightly in favor of a finding of custody.

### 6.    Arrest

The sixth *Griffin* factor is whether the subject was placed under arrest at the

conclusion of the interview.  *Griffin*, 922 F.2d at 1349.  Lack of arrest is a "very

important factor weighing against custody."  *LeBrun*, 363 F.3d at 722 (citing *United*

*States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002)).  Both parties agree that Defendant

was not arrested after the interview.  Accordingly, the sixth indicium of a custodial

environment is not present.

### 7.    Totality of the Circumstances

As discussed above, the circumstances surrounding Defendant's interview present

a mix of facts, some of which suggest a custodial environment and others of which

mitigate against it.  In considering all of the circumstances surrounding the questioning in

light of the Eighth Circuit's decisions in this area, however, the Court finds that the

Government has sustained its burden of proving that the environment in which Defendant

was interviewed did not "approximate a formal arrest," and that a reasonable person in

Defendant's position would have not have felt he was in custody.  Significantly, Agent

Ball and Detective Lindquist informed Defendant that he was not under arrest, was free

to leave, and was not required to provide a statement.  *See Sanchez*, 676 F.3d at 631

("The first *Griffin* factor weighs heavily in favor of noncustody when officers clearly

inform a suspect that []he is free to leave or decline questioning.")  Defendant acquiesced

to answering their questions, the tone was friendly and conversational throughout, and

nothing in the transcript or audiotape of the interview suggested he did not understand or

did not believe he could end the interview if he wished.  Finally, Defendant was not

arrested after the interview ended.  These factors strongly weigh in favor of a finding that

Defendant was not in custody.  While over the duration of the search, Defendant and his

roommates were ostensibly restricted in their ability to move freely around the home,

there is no evidence anyone actually sought to leave the house after it was initially

secured, and therefore no evidence of what would have happened had they made such a

request.  *See id.* (finding the second *Griffin* factor "unclear" because suspect did not

actually attempt to leave and it was "unclear what would have happened if she had").[5]

Moreover, although the Court finds the context of the encounter was police-dominated,

the weight of this factor in the overall analysis is less because it occurred in Defendant's

own home, was consistent with the execution of a search warrant, and the interview itself

was relatively brief.

Accordingly, the Court concludes that Defendant was not in custody on January

12, 2015, and therefore was not entitled to *Miranda* warnings before speaking with

Detective Lindquist and Agent Ball.

---

[5]  The Court is also mindful that the second *Griffin* factor is not an *aggravating* factor,
but a *mitigating* factor.  *United States v. Upshaw*, No. 12-cr-299 (MJD/LIB), 2013 WL
1104759, at *8 (D. Minn. Feb. 5, 2013) (citing *Axsom*, 289 F.3d at 500-01), *report and
recommendation adopted by* 2013 WL 1104267 (D. Minn. Mar. 18, 2013).  In other
words, the "determination that agents restrained Defendant's freedom of movement
merely means that this factor does not weigh in favor of a finding of noncustody; it does
not weigh in favor of a finding of custody."  *Id.*

**IV.    Recommendation**

Based on the foregoing and all of the files, records, and proceedings herein, it is

recommended that:

1.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and
Seizure [Doc. No. 41] be **DENIED**; and

2.    Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc.
No. 42] be **DENIED**.


Dated:  May 22, 2015                     _s/ Hildy Bowbeer_____
                                          HILDY BOWBEER
                                          United States Magistrate Judge


**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore, not appealable directly to the Eighth Circuit Court of
Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a
magistrate judge's proposed finding and recommendations within 14 days after being
served a copy" of the Report and Recommendation.  A party may respond to those
objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All
objections and responses must comply with the word or line limits set forth in LR
72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under
advisement 14 days from the date of its filing.  If timely objections are filed, this Report
and Recommendation will be considered under advisement from the earlier of:
(1) 14 days after the objections are filed; or (2) from the date a timely response is filed.